Michael O. Hardison
Edward W. Floyd
EATON & VAN WINKLE LLP
3 Park Avenue
New York, New York 10016-5902
(212) 779-9910
mhardison@evw.com
efloyd@evw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

SAGAAN DEVELOPMENTS AND
TRADING LTD.,

                Plaintiff,

   -against-

BALTIC SKY SHIPPING LTD., UNIMARS
SHIPPING COMPANY LTD. and UNISHIP
LTD.,

                Defendants.
-----------------------------------------------------------x

09 Civ. 7150 (WHP)
ECF CASE

**VERIFIED COMPLAINT
IN ADMIRALTY**

Plaintiff, Sagaan Developments and Trading Ltd., by its attorneys, Eaton & Van

Winkle LLP, for its complaint against Defendants, Baltic Sky Shipping Ltd., Unimars

Shipping Company Ltd. and Uniship Ltd., upon information and belief, alleges as follows:

## JURISDICTION

1.    This is a case of admiralty and maritime jurisdiction, 28 U.S.C. § 1333, and is

an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of

Civil Procedure and Rule B of the Supplemental Rules For Certain Admiralty And Maritime

Claims.

## PARTIES

2.    At all relevant times, Plaintiff, Sagaan Developments and Trading Ltd. (which uses the logo/trading name Sagaan Marine Trading Ltd.), was and still is a corporation or other business entity organized and existing under the laws of a foreign country with an office and place of business located at Omar Hodge Building, Wickham Cay 1, Road Town, Tortola, British Virgin Islands.

3.    At all relevant times, Defendant, Baltic Sky Shipping Ltd. ("Defendant Baltic Sky"), was and still is a corporation or other business entity organized and existing under the laws of a foreign country with offices and places of business located at Jasmine Court 354ARegent Street, Belize City, Belize and 17 Duntes Street, Riga, LV-1005, Latavia and was the registered owner of the M/V BALTIC SKY.

4.    At all relevant times, Defendant, Unimars Shipping Company Ltd. ("Defendant Unimars"), was and still is a corporation or other business entity organized and existing under the laws of a foreign country with an office and place of business located at 17 Duntes Street, Riga, LV-1005, Latavia and was the operator of the M/V BALTIC SKY.

5.    At all relevant times, Defendant, Uniship Ltd. ("Defendant Uniship"), was and still is a corporation or other business entity organized and existing under the laws of a foreign country with an office and place of business located at 17 Duntes Street, Riga, LV-1005, Latavia and was the ship manager of the M/V BALTIC SKY.

## UNDERLYING EVENTS

6.    On or about March 28, 2008, Defendant Baltic Sky ordered 15 M/T (at $999.00 per M/T) of Marine Gas Oil ("MGO") and 60 M/T (at $669.00 per M/T) of Intermediate Fuel Oil ("IFO") to be delivered to the M/V BALTIC SKY at Arkhangelsk, Russia, in April 2008 (a copy of the bunker order is attached as Exhibit 1).

7.    On or about the same day, Plaintiff confirmed to Defendant Baltic Sky that the required quantities of MGO and IFO would be delivered to the M/V BALTIC SKY, in April 2008, at the specified prices, at Arkhangelsk, Russia, in accordance with the provisions of Plaintiff's General Terms and Conditions of Sale dated May 2000 (a copy of the bunker confirmation is attached as Exhibit 2 and a copy of Plaintiff's General Terms and Conditions of Sale is attached as Exhibit 3).

8.    The bunker confirmation identified the buyers of the bunkers as "Master and/or Owners and/or Charterers and/or Operators and/or Managing Agents and/or Baltic Shipping Ltd." and the sellers as "Sagaan Developments and Trading Ltd." (See Exhibit 2).

9.    On or about April 24, 2008, Plaintiff delivered the required quantities of MGO and IFO to the M/V BALTIC SKY, at the specified prices, at Arkhangelsk, Russia, in accordance with the provisions of Plaintiff's General Terms and Condition of Sale dated May 2000 (a copy of the bunker delivery receipt is attached as Exhibit 4).

10.   On or about April 28, 2008, by Invoice 08-T-404 in the amount of $55,125.00, Plaintiff invoiced Defendants for the MGO and IFO delivered to the M/V BALTIC SKY at Arkhangelsk, Russia (a copy of Invoice 08-T-404 is attached as Exhibit 5).

## CAUSE OF ACTION

11.   Paragraphs 1-10 of this Complaint are repeated and realleged as if the same were set forth here at length.

12.   Defendants failed to pay the purchase price for the MGO and IFO delivered by Plaintiff to the M/V BALTIC SKY, at Arkhangelsk, Russia, on or about April 24, 2008.

13.   Defendants breached the terms of the sales agreement and delivery by failing to pay the purchase price for the MGO and IFO delivered by Plaintiff to the M/V BALTIC SKY, at Arkhangelsk, Russia, on or about April 24, 2008.

14.   Plaintiff has duly performed all obligations owed to Defendants under the terms of the sales agreement and delivery.

15.   Plaintiff, by reason of the premises, has sustained damages, as best can now be calculated, in the amount of $55,125.00.

## RULE B ATTACHMENT

16.   The sales agreement provides that all disputes between Plaintiff and Defendants are to be resolved by the English Courts pursuant to English law.

17.   This action is brought to obtain jurisdiction over Defendants and to obtain security in favor of Plaintiff in respect of its claim against Defendants and in aid of

proceedings before the English Courts.

18.    This action also is brought to obtain security for additional sums to cover Plaintiff's anticipated costs in the proceedings before the English Courts and interest, all of which are recoverable under English law (see *Winter Storm Shipping Ltd. v. TPI*, 310 F.3d 263, 265 (2d Cir. 2002).

19    Upon information and belief, and after investigation, Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising of, inter alia, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants ("Assets"), including but not limited to Assets at, being transferred through, or being transferred and/or wired to or from various banking institutions and/or other business entities.

20.    The bases for Plaintiff's belief that Defendants have, or will shortly have, Assets within this District include, inter alia, the fact that it is common practice for foreign entities who engage in international transactions to make and receive payments in U.S. dollar denominated electronic funds transfers.

21.    Such was the practice in this case because the purchase invoice required payment in U.S. dollars by electronic funds transfer (see Invoice 08-T-404 attached as Exhibit 5).

22.    The requirement that foreign banking institutions have relations with U.S. corresponding banks in order to send or receive payments in U.S. dollars ensures that such transfers and payments pass through the hands of intermediary financial institutions located in this District.

23.    JPMorgan Chase Bank was specifically designated to act as such an intermediary financial institution in connection with the transaction at issue (see Invoice 08-T-404 attached as Exhibit 5).

24.    Plaintiff anticipates and expects, as a result, that U.S. dollar payments made by or being sent to Defendants are to be made by electronic fund transfers passing through an intermediary financial institution within this District.

25.    The total amount sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by Plaintiff against Defendants includes: (i) principal claim in the amount of $55,125.00; (ii) interest, which is recoverable in proceedings before the English Courts, and when such principal claim is compounded at the rate of interest of 2% per month for 1 year and 7 months, equals a compounded principal amount of $104,543.65, and (iii) estimated attorneys' fees and disbursements, together with the costs of the proceedings before the English Courts in the amount of GBP 20,000.00 ($32,952.00 as of August 12, 2009), all of which are recoverable in proceedings before the English Courts, for a total claim of $137,495.65.

## RESERVATION OF RIGHT
## TO PROCEED AGAINST DEFENDANTS BEFORE THE ENGLISH COURTS

26.    The sales agreement provides that any disputes between Plaintiff and Defendants are to be brought before the English Courts pursuant to English law.

27.    Plaintiff expressly reserves the right to proceed against Defendants before the English Courts and brings this action solely to obtain quasi-in-rem jurisdiction and security for its damages, interest and the costs of proceedings before the English Courts.

WHEREFORE, Plaintiff prays as follows;

1.    That process in due form of law according to the practice of this Court may issue against Defendants;

2.    That the Court, in accordance with the provisions of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, direct the issuance of Process of Maritime Attachment and Garnishment attaching all assets within the district owned by Defendants or in which Defendants have a beneficial interest up to the amount of $137,495.65;

3.    That judgment be entered against Defendants and in favor of Plaintiff in the amount of $137,495.65  plus interest, costs, and attorneys' fees; and

4.    That the Court grant such other, further and different relief as may be just, proper and equitable in the premises.

Dated: New York, New York
       August 12, 2009

EATON & VAN WINKLE LLP


By:    /s/  Michael O. Hardison
           Michael O. Hardison

3 Park Avenue
New York, New York 10016-2078
(212) 779-9910

Attorneys for Plaintiff

## **VERIFICATION**

MICHAEL O. HARDISON, Esq., pursuant to the provisions of 28 U.S.C. § 1746, declares and states as follows:

    1.    I am a member of the firm of Eaton & Van Winkle LLP, attorneys for Plaintiff, and I make this verification on behalf of Plaintiff.

    2.    I have read the foregoing complaint and know the contents thereof and the same are true to the best of my knowledge, information and belief. The sources of my information and the grounds for my belief are communications received from Plaintiff, and the insurance underwriters for Plaintiff, and an examination of the papers relating to the matters in suit.

    3.    The reason this verification is made by the undersigned, and not made by Plaintiff, is that Plaintiff is a foreign corporation or other business entity, no officer or director of which is presently within this district.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
          August 12, 2009


                    /s/ Michael O. Hardison
                    Michael O. Hardison

## DECLARATION

MICHAEL O. HARDISON, Esq., pursuant to the provisions of 28 U.S.C. § 1746, declares and states as follows:

1.     I am a member of the firm of Eaton & Van Winkle LLP, attorneys for Plaintiff, and I am familiar with the facts of this matter.

## DEFENDANTS ARE NOT PRESENT IN THE DISTRICT

2.     I execute this part of this declaration in compliance with the provisions of Rule B(1) of the Supplemental Rules For Certain Admiralty and Maritime Claims.

3.     To the best of my information and belief Defendants, Baltic Sky Shipping Ltd., Unimars Shipping Company Ltd. and Uniship Ltd., cannot be found within this District as defined by the relevant State and Federal Rules of Civil Procedure.

4.     I caused a search to be made by going to the New York State Department of State website (www.dos.state.ny.us) and searching the Corporation and Business Entity Database.  This database contained no record of Defendants being either New York corporations or foreign corporations licensed to do business in New York.

5.     I also checked the internet telephone directories for New York state and contacted the telephone information operator regarding a listing for Defendants.  None of these sources contained a listing for Defendants.

6.     I am unaware of any general or managing agents within this District for Defendants.

7.     It is for the foregoing reasons that I request, on behalf of Plaintiff, that the Court execute the accompanying Order For Issuance of Process of Maritime Attachment and Garnishment.

## PRAYER FOR RELIEF TO SEAL CASE TEMPORARILY

8.     Upon information and belief, it is the practice of many law firms in the maritime bar to conduct a daily review of the electronic docket sheet of the Southern District of New York for all maritime actions filed in the district and to inform the defendants named such actions of any ex parte orders of attachment pending against them, thus permitting the purpose of the ex parte application to be defeated.

9.     Upon information and belief, it is the practice of certain publications, including the publication "Tradewinds," to publish the names of defendants named in ex parte orders of attachment, thereby permitting the purpose of the ex parte application to be defeated.

10.     Upon information and belief, "Tradewinds" has recently published the names of parties in Rule B proceedings, the amounts of the attachments and other details of the actions, thereby permitting the purposed of the ex parte application to be defeated.

11.     This Court has an interest in preserving the efficacy of the ex parte order it issues that supersedes the interest in maintaining a public docket during the brief period during which assets are attached and notification of such attachment is provided to the defendant.

12.    Electronic notification to the defendant through public access to ex parte orders of maritime attachment defeats the purpose of obtaining an order ex parte. Such prior notification eliminates the element of surprise and allows defendants to structure their financial transactions to avoid the attachment, thereby undermining the purpose of the attachment.

13.    For the foregoing reasons, Plaintiff requests that the Court issue an Order temporarily sealing the court file in this matter, including the Verified Complaint and all other pleadings, affidavits, declarations and orders herein, until further notice of this Court or until notification to the clerk that property has been attached.

14.    This request is narrowly tailored to Plaintiff's needs. Following attachment of the property, the case should be unsealed as Defendants will have been apprised of the attachment order and the underlying rationale for sealing the case will no longer apply.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
            August 12, 2009


                                                          /s/ Michael O. Hardison
                                                          Michael O. Hardison

*Exhibit*

*1*

# Baltic Sky Shipping Ltd

Tel  : + 371 7076360 (61)
Fax  : + 371 7076362

--------------------------------------------------------------
                                                    Date: 28.03.2008.

Fax   : s.lunev@bunkers.ru
To    : Cockett Marine
Attn  : Sergey Lunev                          Total pages: 1
Re.   : Confirmation

PLS ARRANGE OUR BUNKER NOMINATION AS FOLLOWS :

BUYERS            : Baltic Sky Shipping Ltd
SELLERS           : Cocket Marine Oil Russia
VESSEL            : "Baltic Sky"
SHIPOWNERS        : Baltic Sky Shipping Ltd
FLAG              : Dominica
PLACE OF SUPPLY   : Arkhangelsk (Russia)
E.T.A             : 03. th April
GRADE             : MGO
QUANTITY          : 15  MTN
PRICE             : USD 999.00 PMTD
SPECIFICATION     : IFO 120 LS
QUANTITY          : 60  MTN
PRICE             : USD 669.00 PMTD
PAYMENT TERMS     : 45 days


Baltic Sky Shipping Ltd
Jasmine Court 35ARegent Street, P.O.Box 1777, Belize City, Belize

*Exhibit*

*2*

**Konstantin Yakushin**

From:     "Sergey Lunev" <s.lunev@bunkers.ru>
To:       "Константин ЯКУШИН
Sent:     28 марта 2008 г. 13:20
Subject:  Confirmation - mv BALTIC SKY

SAGAAN

MARINE TRADING LTD

Bunker CONFIRMATION

Company

:

BALTIC SHIPPING Ltd.

Attention

:

Mr. Konstantin YAKUSHIN

From

:

Sergey LUNEV

Dated

:

28.03.2008

Ref

28.03.2008

№ 00363/mv BALTIC SKY

Dear Konstantin,

We confirm that we have on your instructions placed the following firm nomination, which is placed strictly in accordance with our General Terms and Condition of Sale dated May, 2000 (copies available upon request):

Account/Buyers

Master and/or Owners and/or Charters and/or Operators and/or Managing Agents and/or

BALTIC SHIPPING Ltd.

Sellers

SAGAAN DEVELOPMENTS AND TRADING Ltd.

Vessel

mv BALTIC SKY

Delivery port

28.03.2008

Archangelsk

Delivery date

-

02-03.04.2008

Quantity/Grade

-

60  MT  IFO 120LS

15  MT  MGO

Specs

-

ISO 8217 2005 (E) RME -120 max sulph 1.5%

-

ISO 8217 2005 (E) DMA 0,86 max sulphur 0.1 %

Prices

-

US$ 669.00 pmt   IFO 120LS  delivered

-

US$ 999.00 pmt   MGO  delivered

28.03.2008

Payment terms

45 days from date of delivery

Extra charges

NONE

Agents

SOLTRANS / (8182) 249640

Remarks

NONE

Please ensure that Master / Agents are instructed to liaise closely with Suppliers to arrange final quantities and firming for an expeditious supply. Please ensure the Master / vessel's representative witnesses on the supplier's delivery equipment the soundings and measurments of quantities before and after delivery.

No disclaimer stamp on any type or form will be accepted on the bunker delivery receipt, or should any stamp be used it will not after, change or waive the seller's maritime lien against the vessel's ultimate responsibility for the debt incurred through this transaction.

Additional costs, such as overtime, pilotage, wharfage, cancellation fees and local taxes etc or any extra costs incurred during or related to this bunker delivery will be for Buyers account.

We thank you for this nomination.

28.03.2008

Best Regards,

Sagaan Developments and Trading LTD.

SAGAAN DEVELOPMENTS AND TRADING Ltd.

Omar Hodge Building,

Wickham Cay 1, Road Town, Tortola, British Virgin Islands.

Reg. No. 381719

sagaan@bunkers.ru

28.03.2008

*Exhibit*

*3*

# SAGAAN DEVELOPMENTS AND TRADING LTD.

## GENERAL TERMS AND CONDITIONS OF SALE.

**Dated May, 2000**

This is a statement of the terms and conditions applicable to and incorporated into all contracts to sell Marine Fuels entered into by Sagaan Developments and Trading Ltd. of Omar Hodge Building, Wickhams Cay I, P.O. Box 362, Road Town, Tortola, British Virgin Islands. The contract of sale to which these terms and conditions apply shall be constituted by the acceptance in writing (including facsimile or telex) by Sagaan Developments and Trading Limited of the Buyer's order.

1. DEFINITIONS

Unless the context otherwise demands:-

1.1. "Seller" means Sagaan Developments and Trading Ltd.

1.2. "Buyer" means the party requesting the Seller to arrange for the delivery of Marine Fuels

1.3. "Supplier" means the party having Marine Fuels available at a port and requested by the Seller to deliver to the Buyer.

1.4. "Delivery Port" means the place at which the Supplier delivers Marine Fuels against a nomination as described in Clause 2 of these conditions.

1.5. "Marine Fuels" means marine fuel oil, intermediate fuel oil, marine diesel oil, light marine diesel oil, marine gas oil, and marine lubricants.

1.6. "Fuels Prices" means those prices quoted by the Seller against the Buyer's specified requirements.

1.7. "Working Days" means working days in the place where the notice in question is received.

2. NOMINATIONS.

2.1. The Buyer shall give the Seller not least than two (2) clear working days written notice of deliveries required specifying the name of the vessel, the vessel's agents, the loading port, the estimated arrival date and the grades and quantities of Marine Fuels required.

2.2. The Seller may decline a nomination by notice given to the Buyer at any time.

2.3. The Buyer shall ensure that either the Master of a vessel which requires delivery of Marine Fuels, or the accredited representative of the Buyer at the Delivery Port, gives not less than one (1) clear working days advance notice to the Seller or the Supplier of the vessel's readiness to receive delivery or such earlier notice as may be required to make the necessary arrangements or secure any necessary permission from the local authorities to carry out the delivery. The grades and exact quantities of Marine Fuels required and the exact location and time at which delivery is required shall also be declared.

2.4. If the vessel shall not have arrived at the Delivery Port within two (2) calendar days after the expected date of arrival as notified in Clause 2.1. hereof, time being of the essence for this purpose, the Buyer shall, without prejudice to the provisions of Clause 13 hereof be liable to the Seller for all damages, losses and expenses suffered by the Seller consequent upon non-arrival.

2.5. The Supplier nominated by the Seller shall be accepted by the Buyer.

3. PRICES.

3.1. The prices to be paid for Marine Fuels delivered hereunder shall be the prices quoted by the Seller against the Buyer's specified requirements, save that the final price charged to the Buyer may be adjusted to reflect any increase(s) imposed upon the Seller by the Supplier, government or local taxes or duties or otherwise howsoever arising or imposed such as to increase the price to the Seller after the price has been quoted to the Buyer.

4. CHARGES.

In addition to th prices payable for Marine Fuels, the Buyer shall pay the following charges:-

4.1. All charges for any delivery by barge including any barging charges; similarly charges for bulk lorry, rail tank wagon and drum deliveries.

4.2. Any mooring or unmooring charges or port dues which may be incurred by the Supplier in connection with any vessel to which Marine Fuels are delivered hereunder.

4.3. Any expenses incurred as a result of the Master of he vessel rejecting the whole or any part of the delivery including (but without limitation) any losses incurred by the Seller in returning and downgrading the Marine Fuel.

4.4. Any other applicable charges, e.g. overtime or additional costs incurred by the Supplier in respect of deliveries made hereunder.

1

4.5. Any customs or other duties, taxes (other than taxes on profits), impositions, charges, freights, premiums, or other costs incurred by the Supplier, or for which the Supplier is accountable, in respect of deliveries of Marine Fuels hereunder.

4.6. If the Supplier (not having duty-free stocks available, and having first advised the Buyer that this is the case) delivers to the Buyer from the duty paid stocks the amount of such duty.

5. INVOICES.

5.1. The Seller's invoice may be sent by the ordinary or registered post, facsimile, telex or e-mail in the Seller's discretion.

5.2. The Seller shall invoice the Buyer in US Dollars or in such other currency as the Seller may determine.

5.3. Proof of dispatch of the invoices by the Seller shall be deemed proof of receipt by the Buyer.

6. PAYMENT.

6.1. The Buyer shall become liable to pay for Marine Fuels delivered immediately upon the Marine Fuels passing the Buyer's ship's rail and risk in the Marine Fuels shall pass to the Buyer at that time. Any credit arrangements between the Buyer and the Seller shall be totally without prejudice to the Seller's right to require payment forthwith for any delivery of Marine Fuels.

6.2. Payment(s) shall be made in US Dollars nett of all transfer charges, which shall be for Buyer's account.

6.3. If the Buyer has made credit arrangements with the Seller, payment must be made to the Seller not later than midday on the day fixed by the Seller for payment. The Buyer agrees that in event of any failure to pay on time interest compounded at the rate of 2.0 per cent per month or any part of a month from the date fixed for payment to the date payment is actually received by the Seller shall accrue on the amount due to the Seller in respect of the Marine Fuels delivered and shall be paid by the Buyer.

6.4. Any credit arrangements is subject to the Seller's right at any time to demand that payment be made before the date due for payment agreed whether before or after delivery of the Marine Fuels or to demand the giving of such security as the Seller may specify. In the event such demand is made all monies which are demanded shall be immediately due and payable.

6.5. Marine Fuels are supplied on the faith and credit of the vessel (hereinafter called "the vessel") to which they are supplied as well as on the faith and credit of the Buyer and amounts due shall constitute liens against the vessel to the extent permitted by local law.

6.6. If at any time the Buyer has failed to make any payment due or give any security required the Seller shall be under no further obligations whatsoever to the Buyer or the vessel, including without limitation to suspend or terminate any delivery(ies). This is without prejudice to any other right or remedy open to the Seller.

7. DELIVERY.

7.1. Deliveries hereunder shall be made ex wharf or at Seller's option by barge where barging facilities are available.

7.2. Deliveries shall be made during normal working hours at the port in question, unless required at other times and permitted by port regulations in which event the Buyer shall pay all overtime and extra expenses incurred.

7.3. The vessel will be bunkered as promptly as circumstances permit but the Seller shall not be liable for any loss, damage, delay, or demurrage whatsoever which may be suffered by the Buyer as a result of any delay howsoever caused affecting the Supplier's facilities.

7.4. Without prejudice to the provision of Clause 11 delivery is at all times conditional on the availability to the Seller at the port where the delivery is requested of the grade of Marine Fuels requested by the Buyer.

7.5. In any case where delivery is made by barge and the barging is provided or arranged by the Supplier such delivery shall always be within harbor limits as established by the Supplier. Current barge rates plus transportation and other taxes applicable on such deliveries will be charged and the amount in each case will be calculated on the basis of not less than the quantity ordered (but always subject to any applicable minimum delivery provision). Barges making delivery shall be given immediately a clear and safe berth free of cost alongside the vessel's receiving lines and the Buyer shall furnish or pay for necessary steam and pay all wharfage or similar charges incurred.

7.6. In the event the Seller or Supplier may consider that no clear and safe berth is available for delivery, the Seller shall be under no obligation to arrange delivery and shall have no liability for any loss or damage howsoever arising that may be suffered by the Buyer in consequence of such non-delivery.

7.7. The Buyer shall make all connections and disconnections of delivery hose to the vessel and shall give all other necessary assistance including provision of sufficient tankage and equipment to receive promptly deliveries of Marine Fuels hereunder.

7.8. The Buyer shall immediately receive deliveries and promptly withdraw the vessel from the Terminal. For delay by the Buyer in the use of delivery or barging facilities or in vacating the berth, the Buyer shall pay demurrage at the Supplier's current rate.

7.9. The Buyer shall not require Marine Fuels to be delivered into any of the vessel's tanks for the export of which a Government permit is required and has not been obtained by the Buyer or the Buyer's accredited representative.

7.10. The quantity of any grade of Marine Fuels to be delivered shall not exceed the quantity of that grade nominated pursuant to Clause 2.1. above by more than 10 per cent unless the prior written consent of the Seller has been obtained by the Buyer or its accredited representative.

8. TITLE.

8.1. Title in and to the Marine Fuels delivered and/or properly rights in and to such Marine Fuels shall remain vested in the Seller until payment has been received by the Seller of all amounts due in connection with the delivery.

8.2. Until full payment of all monies due to the Seller in respect of the supply of Marine Fuels has been made, the Buyer shall not be entitled to use the bunkers other than for the propulsion of the vessel, nor mix, blend, sell, encumber, pledge, alienate or surrender the bunkers to third parties.

8.3. In the event of non payment (in part or whole) or other breach of these terms and conditions by the Buyer the Seller is entitled to take back the Marine Fuels without prior judicial intervention. Should the Marine Fuels be no longer definably present, the Seller has the right to attach the vessel and/or any sister ship and/or any other assets of the Buyer wherever situated in the world without prior notice. All other rights of the Seller are hereby expressly reserved.

8.4. Where title in and to the Marine Fuels delivered has passed to the Buyer and/or others, the Buyer hereby grants the pledge in favour of the Seller for any and all claims of whatsoever nature and howsoever arising that the Seller may have against the Buyer in respect of the supply of Marine Fuels and on any other Marine Fuels present in the vessel, inclusive of mixture of the delivered Marine Fuels and other Marine Fuels.

9. DOCUMENTS.

9.1. On completion of the delivery of Marine Fuels to a vessel, the Master of the vessel or the Buyer's accredited representative shall give the Supplier a signed receipt therefore in a form determined by the Supplier.

10. QUALITY.

10.1. Marine Fuels to be sold shall be the Supplier's regular commercial grades of bunker fuel oil and/or intermediate fuel oil and/or marine diesel oil and/or light marine diesel oil and/or marine gas oil which may be offered at the time and place of delivery by the Seller or its appointed suppliers or authorized agents.

10.2. The Buyer shall have sole responsibility for the grade and type of Marine Fuels ordered for use in the vessels nominated by the Buyer.

10.3. The Seller gives no guarantee or warranty merchantability, fitness or suitability of the Marine Fuels delivered for any particular purposes or otherwise which extends beyond the description of Marine Fuels ordered.

10.4. Without prejudice to the generality of these terms and conditions, in the event of the non-delivery or late delivery of fuel or of fuel delivered not complying as to grade quantity or quality or in any other manner with the terms stipulated herein or otherwise agreed between Buyer and Seller:-

10.4.1. the amount of damages that the Buyer can claim from the Seller shall be limited to damages actually recovered by the Seller against the Supplier;

10.4.2. notwithstanding the provisions of Sub-clause 10.4.1. of this clause, nothing in these terms and conditions shall prejudice
    (a)  the Buyer's rights in respect of implied conditions as to title;
    (b)  the Buyer's rights to recover damages from the Seller where the damage complained of arose solely through the direct fault of the Seller while the fuel was in the ownership of the Seller provided that any such claim shall not exceed the invoice value of the fuel.

11. MEASUREMENTS.

11.1. The quantity of Marine Fuels delivered shall be determined from the gauge or meter of the shore tank or the barge effecting delivery at the election of the Supplier. Adjustment in volume owing to difference in temperature shall be made in accordance with ASTM-IP Petroleum Measurement Tables or the methods of any other recognized standards authority at the discretion of the Supplier. The Buyer may be present or represented by its properly accredited representative when such measurements are taken, but if the Buyer is not present or represented then the determination of quantity made by the Supplier shall be deemed to be correct.

12. CLAIMS.

12.1. The Buyer shall be deemed to have waived any claim against the Seller or the Supplier relating to the quantity, quality or price of any Marine Fuels delivered hereunder, unless made in writing within six (6) days of the date of delivery in question.

12.2. Any claim by the Buyer must be made in writing and proceedings must be commenced within three (3) months of delivery and where this provision is not complied with, the Buyer's claim shall be deemed to be waived and absolutely barred.

12.3. Save as contemplated by Clause 6.8. each order for delivery is deemed to represent a separate contract.

13. FORS MAJEUR.

13.1. The Seller shall not be responsible for any delay or failure to deliver Marine Fuels where performance is delayed, prevented or made substantially more expensive by circumstances beyond the Seller's control. The Seller shall not be

3

liable for any demurrage or any other loss or damage howsoever arising resulting from such delay or failure to perform.

14. ENVIRONMENTAL PROTECTION.

14.1. If an escape, spillage or discharge of oil (a "spill") occurs while a delivery of Marine Fuels is being made on behalf of the Buyer, the Buyer will promptly take such action as is reasonably necessary to remove the oil and mitigate the effects of such spill.

14.2. Notwithstanding the cause of such spill the Seller or the Supplier is hereby authorized, at its option with or without notice to the Buyer, or the Buyer's operator of, or agent for, the receiving vessel, to take such measures, either in co-operation with the Buyer, or alone, and incur such expenses (whether by employing its own resources or by contracting others) as are reasonably necessary in the judgment of the Seller or the Supplier, to remove the oil and mitigate the effects of such spill. If the Seller shall exercise such option, the Buyer shall co-operate and render such assistance as is required by the Seller. Exercise of such option by the Seller shall not be construed as an admission of liability for the cause of the spill.

14.3. Any expenses, damages, costs, fines and penalties arising from the escape, spillage, discharge or pollution of oil shall be borne by the party that caused by its negligent act or omission even if paid in the first instance by the other party. If both parties have acted negligently, any expenses, damages, costs, fines and penalties arising shall be divided between the parties in accordance with their respective degrees of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer also agrees to give or cause to be given, to the Seller, all such documents, and other information concerning any spill, or any program for the prevention thereof, which are requested by the Seller, or required by laws or regulations applicable at the time and place where the Seller or the Supplier delivers Marine Fuels to the Buyer.

15. INDEMNITY.

15.1. The Buyer will indemnify the Seller and the Supplier against any claims, losses, costs (including costs as between attorney or solicitor and client), damages, liabilities, fines, penalties and expenses incurred or sustained arising out of or in connection with the delivery of Marine Fuels against a nomination except to the extent that such claims, losses, costs, damages, liabilities and expenses arise through the negligent act or omission of the Seller or the Supplier.

16. WAIVER.

16.1. Any waiver by the Seller, the Supplier or the Buyer, of any of their respective rights hereunder or in respect of a nomination shall not prejudice their respective rights to enforce the same strictly and in full on any subsequent occasion.

17. AGENTS.

17.1. If the nomination is made by an agent acting for or on behalf of the Buyer, whether such agency is disclosed or undisclosed then such agent shall be liable, as well as the Buyer, not only as agent but also as principal for the performance of all the obligations of the Buyer.

18. NOTICES.

18.1. Notices to be given hereunder shall be addressed to the last known address of the party to whom the notice is addressed.

18.2. Where a nomination is made by an agent acting for the Buyer than notice may be given either to the agent or to the Buyer at the option of the Seller.

18.3. Notices shall be given by actual delivery or by registered or ordinary post, facsimile, telex or e-mail. Proof of dispatch by post shall be deemed proof of receipt in due course.

19. GOVERNING LAW.

19.1. Save that the Seller may take such action or actions as it shall in its absolute discretion consider necessary to enforce, safeguard or secure its rights hereunder in any court or tribunal or any state or country, the provisions hereof shall be governed by the law of England and the jurisdiction of the English Courts.

20. AMENDMENTS AND REPRESENTATIONS.

20.1. The Buyer is hereby notified that no employee of the Seller has authority to make or accept any alteration or amendment to the terms and conditions contained herein or to make any representation binding upon the Seller.

21. SEVERABILITY.

21.1. If any provision of this agreement is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable the invalidity or unenforceability of such provision shall not affect the other provisions of this agreement and all provisions not affected by such invalidity or unenforceability shall remain in full force and effect unless the severance of the invalid or unenforceable provision would unreasonably frustrate the commercial purposes of this agreement.

4

*Exhibit*

*4*

# БУНКЕРНАЯ РАСПИСКА  № 3/242
## BUNKER DELIVERY RECEIPT

ЗАО "БУНКЕРНАЯ КОМПАНИЯ"
JSC BUNKER COMPANY

163020 Архангельск, ул. Вычегда 13/1
тел. (8182) 23 23 37, факс (8182) 23 23 45
13/1 Vychegda st., 163020, Archangel, Russia
тел. +7 (8182) 65 77 93, fax. +7 (8182) 23 23 45
e-mail: abc@bunker.ru http:/: www.abcbunker.ru

| | |
|---|---|
| Судно, Vessel's name | "Baltic Sky" через э/к  В 853 А° |
| Бункеровщик, Barge's name | н/б" Онега" IMO 0 |
| Место доставки: Place of delivery: | порт Архангельск  Кр Куэнца  port Archangel |

| | |
|---|---|
| Марка нефтепродукта | Топливо дизельное летнее Л 0,2-62 |
| | [MGO (DMA)] |
| Паспорт качества Fuel Quality certificate | № 472 от 12.03.2008 |
| Температура топлива, °C Delivery temp, °C | |
| Плотность при реф. температуре Mean reading after bunkering | 0 |
| Плот раз, до бункеровки Meter reading prior bunkering | 0 |
| Плот раз, после бункеровки Meter reading after bunkering | 4,9 |
| Объем, м³ Volume, m³ | 4,900 |
| Вода, % Water, % | |
| Плотность г/см³ Density g/cm³ | 0,846 при/at 0°C  0,940 при/at 15°C |
| Количество, тн. Quantity, mt | 4,155 |
| Вязкость кинематич., сСт Kinematic viscosity, сSt | 4,2 (при/at 20°C) |
| Содержание серы, % Sulphur, % | 0,0132 |
| Проба по MARPOL Marpol sample | 008999 |
| Проба судовая Vessel's sample (commercial) | 008997 |
| Проба бункеровщика Barge's sample | 008998 |

| | | |
|---|---|---|
| Дата и время начала бункеровки: Bunkering commenced dateline | 15.04.2008 | 08:30.00 |
| Дата и время окончания бункеровки: Bunkering completed dateline | 15.04.2008 | 10:30.00 |

**Декларация:**
ЗАО "Бункерная компания" подтверждает, что нами будут выполнены все положения Приложения VI к Конвенции MARPOL 73/78 и в частности правил 14 и 18, дополнения V и резолюции IMO МЕРС 98(47)

**Declaration:**
JSC Bunker Company declares that the fuel Oil Supplied to the Vessel is in full conformity with Annex VI and with the MARPOL 73/78 convention and in particular rules 14 and 18 and guarantee that the max Sulphur content less then 4,5% and absence of deleterious materials in the fuel

Количество иФО, выставленного к оплате, может включать в себя удержания до 0,5 % воды включительно в соответствии с ISO 8217(E):2005, (Количество воды, превышающее 0,5 %, в счет включено не будет
Actual quantity of IFO to be paid is to be deducted if water contents exceeds 0.5% as to ISO 8217(E):2005 (Le. water contents up to 0.2% is not included into invoice)

М.П.
М.А.Алексин

Бункер и пробы получены должным образом
Bunker and sample received in good order

Ст.мех.
of Barge

Ст. механик
Engineer in charge of the Vessel

МП

Бункер Со FORM № 2

ISO 9001

# БУНКЕРНАЯ РАСПИСКА № 1/176
# BUNKER DELIVERY RECEIPT

ЗАО "БУНКЕРНАЯ КОМПАНИЯ"
JSC BUNKER COMPANY

Судно: / Vessel's name: m/v "BALTIC SKY" ИМО 7935516

Бункеровщик: / Barge's name: сб/з "Zelenets"

Место доставки: / Place of delivery: порт Архангельск / порт Экономия

Дата и время начала бункеровки: / Bunkering commenced: date/time: 24.04.2006  13:10:00

Дата и время окончания: / Bunkering completed: date/time: 24.04.2006  15:00:00

| | | |
|---|---|---|
| Марка нефтепродукта / Oil Grade | Топливо дизельное летнее (ГКО (ОЧ=43)) ГОСТ Р-40 (ГОСТ305-89)) | |
| Паспорт качества / Fuel quality certificate | № 475 от 12.03.2006 | № 727 от 23.04.2008 |
| Температура топлива, °С / Delivery temp, °С | 0 | 35 |
| Количество, тн. / Quantity, т. | 10.645 | 60.000 |
| Вязкость кинематич., сСт / Kinematic viscosity, cSt | 27322.2 (при/at 20°C) 27334.99 | 11672 11737.29 (при/at 80°C) |
| Содержание серы, % / Sulphur, % | 0.0110 | 1.3 |
| Плотность /см³ / Density g/cm³ | 0.848 при/at 0°C 0.838 при/at 15°C | 0.919 при/at 35°C 0.852 при/at 15°C |
| Объем, м³ / Volume, m³ | 12.789 | 65.288 |
| Вода, % / Water, % | 0 | 0.3 |
| Проба бункеровщика / Barge's sample | 758810 | 756902 |
| Проба по МАРПОЛ | 758811 | 756800 |
| Проба судовая / Vessel's sample (commercial) | 758812 | 756800 |

Декларация: / Declaration: ЗАО "Бункерная компания" подтверждает, что нами будут выполнены все положения Приложения VI к МАРПОЛ 73/78 и в частности правил 14 и 18, дополнения V и рекомендации ИМО (MEPC.96(47)).

JSC Bunker Company declare that the fuel Oil Supplied to the Vessel is in full conformity with the MARPOL 73/78 and guarantee that the max Sulphur content less than 4.5% and absence of deleterious materials in the fuel.

Количество ИФО, доставленного к оплату, может включать в соответствии с точкой возможного содержания воды, превышающее 0.5%, в счет включено не будет.

Actual quantity of IFO to be paid for is to be deducted if water contents exceeds 0.5% as to ISO 8217(E)2005 (i.e. if water contents exceeds 0.5% this amount is not included into invoice).

Ст. механик / Engineer    Charge of the Vessel

МП / Stamp

Склоняющий капитана / Watch Officer of Barge

МП / Stamp

Молотилов А. / Ст. механик Е.



*Exhibit*

*5*

# SAGAAN

**MARINE TRADING LTD**

Bunker INVOICE

## INVOICE 08-T-404

ACCOUNT    -    BALTIC SHIPPING Ltd. c/o UNIMARS
                               17 Duntes Street,
                               Riga, LV -1005, Latvia

INVOICE DATE    -    28.04.2008

To the cost of the bunkers supplied to:

| | | |
|---|---|---|
| Vessel | - | mv BALTIC SKY |
| Delivery port | - | Archangelsk |
| Delivery date | - | 24.04.2008 |
| Payment terms | - | 45 days from date of delivery |
| Due date | - | **08.06.2008** |

| Description | Quantity | Unit price, US$ | Amount, US$ |
|---|---|---|---|
| IFO 120 | 60.000 mts | 669.00 pmt | 40,140.00 |
| MGO Dma max sulphur 0.1 pct | 15.000 mts | 999.00 pmt | 14,985.00 |
| | | Total, US$ | 55,125.00 |

**Please pay in full with all charges to be for Buyer's account.**

Payable by telegraphic transfer on or before the Due Date to:-

| | |
|---|---|
| Bankers | PAREX BANK, Riga, Latvia |
| S.W.I.F.T. | PARX LV22 |
| | |
| Beneficiary | SAGAAN DEVELOPMENTS AND TRADING Ltd. |
| Account IBAN: | LV57 PARX 0000 3627 7101 3 |
| Intermediary bank | JPMORGAN CHASE BANK, New York, USA |
| S.W.I.F.T. | CHASUS33 |
| Intermediary account | 400807572 |

SAGAAN DEVELOPMENTS AND TRADING Ltd.
Omar Hodge Building,
Wickham Cay 1, Road Town, Tortola, British Virgin Islands.
Reg. No. 381719
sagaan@bunkers.ru